961 P.2d 449

Luella HUTCHERSON and Alma L. Usher, Plaintiffs–Appellees, Cross–Appellants.

v.

CITY OF PHOENIX, a municipal corporation, Defendant–Appellant, Cross–Appellee.

No. CV–96–0615–PR.

Supreme Court of Arizona, En Banc.

July 2, 1998.

Jones, Skelton & Hochuli by Georgia A. Staton and Eileen J. Dennis, Phoenix, for Appellant/Cross Appellee.

Treon, Strick, Lucia & Aguirre by Richard T. Treon and Arthur G. Newman, Jr., Phoenix, for Appellees/Cross Appellants.

Hirsh, Davis & Piccarreta by JoJene E. Mills, Tucson, for Amicus Curiae, Arizona Trial.

The Langerman Law Offices by Amy G. Langerman, Phoenix, for Amicus Curiae, Arizona Trial Lawyers Association.

## OPINION

ZLAKET, Chief Justice.

¶1 On a Saturday morning at 11:26, City of Phoenix emergency operator Belinda Banda received a 911 call from Chiquita Burt, who said, "[S]omeone just keeps harassing me ... he's threatening to do something to my boyfriend's car." The "someone," she explained, was Craig Gardner, who was unhappy that she had earlier broken off their relationship.

¶2 Burt told the operator that Gardner had tried to assault her at a nightclub the previous evening, threatening to kill her and her family. She had gone to the Tempe and Phoenix police to get a restraining order, but was told that she would have to wait until the courts opened the following Monday. During the night, Gardner had tried to locate her, twice showing up at a friend's residence in the early morning hours. Burt fled to the apartment of her new boyfriend, Darryl Usher, a professional football player.

¶3 She further told Banda that Gardner knew where Usher lived and had just called saying he was coming over to "do something" to Usher's car. The 911 operator asked if Gardner was an ex-boyfriend. "Yeah, he is," she answered. "And um, my boyfriend [Usher] said if he comes over here, he's gonna shoot him."

¶4 Burt asked what she could do to deal with Gardner. Banda briefly described the process for obtaining a restraining order. Burt responded: "[B]ut I'm talking about, about right now. What can I do?"

Banda: "Where does he live? Nearby or something?"

Burt: "Yeah, he lives close."

Banda: "Well, how close is close to where you're at now?"

Burt: "I'm like five minutes, not even five minutes away."

¶5 The 911 operator then obtained the address Burt was calling from, including the apartment complex name and building number. Twice in the ensuing minutes, Banda told Burt that she would be sending an officer. "Well, we can have an officer come out there and take some information. If he happens to show up, though, before an officer gets there, you need to call us right away, okay, and tell us he's there now."

¶6 Burt repeated her concern that trouble might be brewing because of Gardner's threats and his all-night pursuit of her. "[A]nd I'm—I'm just trying to prevent somebody from getting hurt." Banda concluded the call by saying: "Okay, well, we'll send an officer out there, um like I said, if he happens to show up at the apartment before the officers first do, just call us back right away, okay?"

¶7 Twenty-two minutes after Burt's call to 911, Craig Gardner went through the front window of Usher's apartment and fatally shot both Darryl Usher and Chiquita Burt. He

then put the gun to his own head and killed himself.

¶ 8   The victims' mothers brought wrongful death actions against the City of Phoenix for its handling of the 911 call. The plaintiffs claimed that the City was liable because the operator had improperly categorized Burt's call as Priority 3, the Phoenix Police Department's lowest rating, reserved for "service" or "report" calls of crimes after the fact. During this period, Priority 3 calls had an average response time of 32.6 minutes. Priority 1, or emergency "hot" calls for crimes in progress posing a threat of immediate personal danger, had an average response time of 4.4 minutes. Priority 2 calls, often used for domestic violence incidents, averaged 13.6 minutes.

¶ 9   The plaintiffs also alleged that Banda had negligently failed to prepare and convey a supplemental dispatch card to police radio personnel according to departmental policy, further hampering a response. When witnesses at Usher's apartment called 911 to report the shooting, Phoenix police arrived on the scene within seven minutes.

¶ 10   The jury found the City negligent and awarded Burt's mother $600,000, and Usher's mother $1.1 million. The jury assigned seventy-five percent of the liability to the City. The defense moved alternatively for a new trial, a remittitur, or judgment notwithstanding the verdict. The trial judge denied all motions and the City appealed.

¶ 11   The court of appeals affirmed the liability and damage verdicts, but reversed and remanded for a new trial on the apportionment of fault, concluding: "The evidence does not justify a verdict that the 911 operator was three times as much at fault for the wrongful deaths of Plaintiffs' decedents as Gardner, who intentionally shot and killed Plaintiffs' decedents." *Hutcherson v. City of Phoenix,* 188 Ariz. 183, 187, 933 P.2d 1251, 1255 (App.1996).

## STANDARD OF REVIEW

¶ 12   We review the trial judge's decision to deny post-trial motions for an abuse of discretion, recognizing that he had substantial latitude in deciding whether to upset

the verdict. *See Creamer v. Troiano,* 108 Ariz. 573, 577, 503 P.2d 794, 798 (1972); *Mammo v. State,* 138 Ariz. 528, 533–34, 675 P.2d 1347, 1352–53 (App.1983). Our reason for deference is clear. "The judge sees the witnesses, hears the testimony, and has a special perspective of the relationship between the evidence and the verdict which cannot be recreated by a reviewing court from the printed record." *Reeves v. Markle,* 119 Ariz. 159, 163, 579 P.2d 1382, 1386 (1978); *see Creamer,* 108 Ariz. at 575, 503 P.2d at 796 (A court's "ruling on additur, remittitur, and new trial, because of an inadequate or excessive verdict, will generally be affirmed, because it will nearly always be more soundly based than ours can be.").

¶ 13   We also review the evidence in a light most favorable to upholding the jury verdict. *See McFarlin v. Hall,* 127 Ariz. 220, 224, 619 P.2d 729, 733 (1980). Thus, if any substantial evidence exists permitting reasonable persons to reach such a result, we will affirm the judgment. *See Styles v. Ceranski,* 185 Ariz. 448, 450, 916 P.2d 1164, 1166 (App.1996).

¶ 14   The court of appeals' majority acknowledged this approach.

It is, of course, the invariable rule of this court that, where there is a dispute in the evidence from which reasonable [persons] could arrive at different conclusions as to the ultimate facts, we will not disturb the findings of a trial court or the verdict of a jury because we do not agree with the conclusion reached. On the other hand, if there is no evidence in the record which would justify such a conclusion by the triers of fact, it is not only our right, but our duty, to set aside a verdict.

*Hutcherson,* 188 Ariz. at 196, 933 P.2d at 1264 (quoting *Spain v. Griffith,* 42 Ariz. 304, 305, 25 P.2d 551, 551 (1933)).

## APPORTIONMENT OF FAULT

¶ 15   We begin with the following question: In Arizona's comparative negligence scheme, can a jury compare the negligent conduct of one tortfeasor with the intentional conduct of another? When our legislature adopted the Uniform Contribution Among

Tortfeasors Act (UCATA) in 1984, it eliminated the harshness of an all-or-nothing contributory negligence defense. *See* 1984 Ariz. Sess. Laws, ch. 237, § 1, codified at A.R.S. §§ 12–2501 through 12–2509 (1994). In 1987, lawmakers abolished joint and several liability. *See* 1987 Ariz. Sess. Laws, ch. 1, § 2, codified at A.R.S. § 12–2506(A) (1994). The statute now provides that a jury shall allocate the responsibility of each actor "in direct proportion to that person's percentage of fault." *Id.* The trier of fact may consider the conduct of both parties and nonparties, A.R.S. § 12–2506(B), apportioning relative degrees of fault "as a whole at one time." *Id.* § 12–2506(C).

¶ 16  Guiding this statutory revision was a desire to "increase the fairness of the tort system for both plaintiffs and defendants" by making each tortfeasor liable for only his or her share of fault, and no more. Scot Butler, III & G. David Gage, *Comparative Negligence & Uniform Contribution: New Arizona Law*, 20 Ariz. B.J. 16, 16 (1984); *see also Dietz v. General Elec. Co.*, 169 Ariz. 505, 510, 821 P.2d 166, 171 (1991) (discussing the legislative history of UCATA and the right of contribution under the new statutory scheme).

¶ 17  A.R.S. § 12–2506(F)(2) defines "fault" as

an actionable breach of legal duty, act or omission proximately causing or contributing to injury or damages sustained by a person seeking recovery, including negligence in all of its degrees, contributory negligence, assumption of risk, strict liability, breach of express or implied warranty of a product, products liability and misuse, modification or abuse of a product.

*See also* Revised Arizona Jury Instructions (Civil), at 31 (3d ed.1997)(" 'fault' is an actionable wrong, plus causation"). The statutory definition is extremely broad. For example, it would seem to permit the comparison of negligence with strict liability. It also expressly includes "negligence in all of its degrees." Accordingly, recent cases have permitted a comparison of reckless, willful, or wanton conduct with negligent conduct. *See Williams v. Thude*, 188 Ariz. 257, 260, 934 P.2d 1349, 1351 (1997); *Natseway v. City of Tempe*, 184 Ariz. 374, 376–77, 909 P.2d 441, 443–44 (App.1995); *Wareing v. Falk*, 182 Ariz. 495, 500, 897 P.2d 1381, 1386 (App. 1995).

¶ 18  Traditional legal principles prohibited comparing negligent and intentional conduct on the premise that the two were "different in kind." *See* Jake Dear & Steven E. Zipperstein, *Comparative Fault and Intentional Torts: Doctrinal Barriers and Policy Considerations*, 24 Santa Clara L.Rev. 1, 5 (1984); Jordan H. Leibman, *Comparative Contribution and Intentional Torts: A Remaining Roadblock to Damages Apportionment*, 30 Am. Bus. L.J. 677, 682–83 (1993). However, legal scholars and at least one state supreme court have suggested that different types of tortious conduct, ranging from negligent to intentional, are merely points along a fault continuum and should be thought of not as "different-in-kind," but rather "different-in-degree." *See, e.g.*, Dear & Zipperstein, *supra*, at 13, 15–16; *Blazovic v. Andrich*, 124 N.J. 90, 106–08, 590 A.2d 222, 231 (1991).

¶ 19  In *Thomas v. First Interstate Bank*, the court of appeals permitted fault of a negligent defendant to be compared with that of a nonparty who committed murder. 187 Ariz. 488, 930 P.2d 1002 (App.1996). The court countered arguments that § 12–2506 does not cover "criminal conduct" [1] by observing:

As plaintiffs acknowledge, however, some acts are both torts and crimes. The tort remedy for criminal homicide is, of course, an action for wrongful death. A plain meaning interpretation of § 12–2506 encounters no ambiguity. The legislature defined fault broadly to include all types of fault committed by all persons.

*Id.* at 489, 930 P.2d at 1003.

¶ 20  Similarly, no compelling authority has been cited for the proposition

---

**1.** In their brief to the court of appeals, plaintiffs suggested that "where the negligence in question is the failure to meet one's obligation to protect another from criminal conduct, that person may not apportion *any* fault to the criminal conduct." Our opinion does not address the merits of this contention because it has not been raised here.

that intentional conduct must be given more weight than negligent conduct in the apportionment of fault. As the court of appeals noted, the line of Kansas cases relied on by the City is unpersuasive because that state's statute does not parallel our own. *See Hutcherson*, 188 Ariz. at 193, 933 P.2d at 1261. Based on the Arizona law, we conclude that a jury may apportion fault among defendants and nonparties, without distinguishing between intentional and negligent conduct or requiring that a minimum percentage of responsibility be assigned to the former. *See Barth v. Coleman*, 118 N.M. 1, 4, 878 P.2d 319, 322 (1994) (holding that bar owner's negligence may be compared to conduct of third-party intentional tortfeasor); *Reichert v. Atler*, 117 N.M. 623, 626, 875 P.2d 379, 382 (1994) (finding that business owner's "negligent failure to protect patrons from foreseeable harm may be compared to the [intentional] conduct of the third party").

¶ 21 We have no doubt that jurors are capable of evaluating degrees of fault, and the statute reflects our legislature's agreement. As the court of appeals has observed: "We believe that a jury . . . will be able to understand the duties involved in situations similar to this case, and will be able to equitably apportion fault according to those duties and the facts presented in the particular case." *Natseway*, 184 Ariz. at 378, 909 P.2d at 445; *see also Thomas*, 187 Ariz. at 490, 930 P.2d at 1004. We find that under the statute, this jury had the authority to do exactly what it did.

### Motion for New Trial

¶ 22 A new trial may be granted for a number of reasons, among them: "excessive or insufficient damages," an outcome that is "the result of passion or prejudice," and a "verdict, decision, findings of fact, or judgment [that] is not justified by the evidence or is contrary to law." Ariz. R. Civ. P. 59(a)(5), (7), (8). Defendant argued to the trial court that these grounds for relief were all present in this case.

¶ 23 In ruling on a motion for new trial the judge sits as the "thirteenth juror" (the ninth juror in a civil case). *See Reeves*, 119 Ariz. at 163, 579 P.2d at 1386. The basic question he or she must ask is whether the jury verdict is so "manifestly unfair, unreasonable and outrageous as to shock the conscience." *Young Candy & Tobacco Co. v. Montoya*, 91 Ariz. 363, 370, 372 P.2d 703, 707 (1962).

¶ 24 Defendant does not claim that the damages here are excessive, but rather that *its share* of the award is disproportionate to that of the nonparty at fault, Craig Gardner. It argues that because the 911 operator used her "best judgment" under the circumstances, assigning seventy-five percent of the blame to her and only twenty-five percent to the person who fatally shot two people is "illogical and illaudable."

¶ 25 We believe, however, that Judge Grant's dissent in the court below better frames the appropriate analysis by emphasizing the difference between "culpability" and "responsibility for foresight and avoidance." *Hutcherson*, 188 Ariz. at 197–98, 933 P.2d at 1265–66 (Grant, J., dissenting). She observed:

> The murderer's culpability is enormous, the operator's is slight. He committed deliberate homicide; she misjudged the severity of the call. And when it comes to contribution to causation, at first blush, the imbalance again weighs heavily toward the murderer. When you add relative timing into the picture, however, the balance starts to shift. The operator has notice of a potentially imminent harm and a chance to avoid it. This is a proper factor for the fact finder to weigh. It is also proper for the fact finder to weigh the operator's responsibility for foresight and avoidance. It enters into the weighing of relative degrees of fault.

*Id.* at 197, 933 P.2d at 1265 (Grant, J., dissenting).

¶ 26 The City clearly had a duty to act reasonably in handling emergency calls. *See Austin v. City of Scottsdale*, 140 Ariz. 579, 581–82, 684 P.2d 151, 153–54 (1984). By creating a 911 system, it accepted the obligation of attempting to prevent the very kind of harm that occurred here. *See De Long v. County of Erie*, 60 N.Y.2d 296, 304–05, 469 N.Y.S.2d 611, 615–16, 457 N.E.2d

717, 721 (1983) (finding that city owed a special duty to victim by creating a 911 system and encouraging people to use it to speed police response). Because the jurors could have found that an opportunity to avert this harm was lost by virtue of the operator's negligence, we will not second-guess their allocation of fault.

¶ 27   We agree with the dissent below that the court of appeals' majority improperly substituted "its view of the evidence for that of the jury and of the trial court." *Hutcherson,* 188 Ariz. at 197, 933 P.2d at 1265 (Grant, J., dissenting). In considering whether sufficient proof existed to support the jury verdict, we look to the broad scope of the trial and do not attempt to reweigh the facts. *See City of Glendale v. Bradshaw,* 114 Ariz. 236, 238, 560 P.2d 420, 422 (1977). We must not "take the case away from the jury" by combing the record for evidence supporting a conclusion or inference different from that reached here. *See Tennant v. Peoria & Pekin Union Ry. Co.,* 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520, 525 (1944). "Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *Id.*

¶ 28   The record is replete with examples of defendant's deviation from an appropriate standard of care, beginning with the improper prioritization of the 911 call. The plaintiffs' expert on 911 systems, a veteran of twenty-nine years in law enforcement including eleven years as a police chief, testified that it was unreasonable for the 911 operator to classify Chiquita Burt's call as Priority 3. It was, he said, a violation of the Phoenix Police Department's own policies. Based upon the department's Communications Bureau Manual, the witness stated that the call should have been treated as Priority 1, an "emergency hot call." He also explained that the call fell within the department's definition of domestic violence, which the training manual says is "never priority 3."

¶ 29   Operator Banda testified that she designated Burt's call a Priority 3 so an officer "could go out there and take information or make a report," not to prevent a potential injury to person or property. Banda said that she did not consider this a domestic violence situation because Gardner was not with Burt at the time of the call. Moreover, she reported, Burt spoke calmly and without excitement.

¶ 30   The jury may well have found this explanation shockingly inadequate, given the information Banda had obtained—that Gardner had threatened to kill Burt and her family the night before, that he had just called and said he was on his way over, that he lived only five minutes away, and that Usher had threatened to shoot Gardner.

¶ 31   As for the calmness in Burt's voice, the manual that was the basis for Banda's training, introduced at trial, contained a lesson plan for recognizing "hot" or Priority 1 calls by the caller's manner of speaking. The list identified six typical vocal characteristics for emergency hot calls, including "silence" and "very calm." The training manuals cautioned 911 operators not to reach conclusions based solely on the sound of a voice. Moreover, the jurors heard for themselves a tape recording of Burt's call.

¶ 32   The operator admitted that she erroneously failed to forward supplemental information to the radio dispatcher. This means that the responding officers could not have known that Usher had threatened to shoot Gardner. Usher's statement clearly implied the presence of a gun—information vital to the police in assessing the call and responding to the danger. Had this fact been relayed, the police response might have been much different.

¶ 33   Finally, the operator's statement that she would be sending an officer might well have induced Burt and Usher to stay in the apartment rather than leave for a safer place. When one voluntarily assumes responsibility for safeguarding human life, a substantial probability exists that others will rely on this action and fail to take independent steps to prevent the harm. *See, e.g., De Long,* 469 N.Y.S.2d at 615–16, 457 N.E.2d at 721. Thus, the unreasonable performance of such a duty may result in injuries that would not have occurred but for the voluntary assumption of care.

¶ 34  In this case, immediately after determining her location, Banda told Burt that an officer would be dispatched. While Banda did not promise an immediate response, she also did not tell Burt that she considered this little more than a routine "service call," or that "help" was unlikely to arrive for more than thirty minutes. Consequently, a "jury could have reasonably inferred that by telling the victim that the City would send a police officer to meet her at the apartment, the operator was telling the victim to stay put and wait for the officer." *Hutcherson,* 188 Ariz. at 200, 933 P.2d at 1268 (Grant, J., dissenting).

¶ 35  The City argues that its 911 system is not infallible. The operation receives thousands of calls a day. As a result, the municipality claims, 911 operators can only be expected to use their "best judgment" under the circumstances. We understand human frailty, and the difficulty of extracting vital and accurate information from a relentless stream of callers, many of whom are in the throes of fear, anger, distress, or pain. Yet, the public has been conditioned to expect and believe that the 911 system is there to protect it, even rescue it, when danger looms. This emergency system, our citizens are told, is as critical a tool in the police department's crime prevention arsenal as the officer's service revolver, nightstick, or patrol car. Consequently, a 911 operator must treat each call as presumptively legitimate and draw upon training, experience, and good judgment to set in motion a reasonable police response.

¶ 36  The City further alleges that the jury's apportionment must have been the result of passion or prejudice. Once again, the analysis must begin with a simple question: Is the award "so unreasonable and outrageous as to shock the conscience of this court?" *Stallcup v. Rathbun,* 76 Ariz. 63, 66, 258 P.2d 821, 824 (1953). Our answer is no. The allocation of fault is not manifestly unfair or shocking for all the reasons previously discussed. Moreover, verdict size alone does not signal passion or prejudice. *See Braun v. Moreno,* 11 Ariz.App. 509, 512, 466 P.2d 60, 63 (1970). Having heard the witnesses and seen the evidence, the trial court was in the best position to determine whether this verdict was the result of passion or prejudice.

## CONCLUSION

¶ 37  The record reflects that the trial judge had no doubt about his authority to grant a new trial if he found the verdict to be against the weight of the evidence. Moreover, both sides agreed at the hearing on post-trial motions that this would be the proper remedy upon such a finding. Having fully considered the matter, the court allowed the jury allocation to stand. We find no abuse of discretion in this decision. We vacate the opinion of the court of appeals and affirm the judgment of the superior court.

JONES, V.C.J., FELDMAN and MARTONE, JJ., and JAMES MOELLER, Justice (Retired), concur.