IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellant*,

*v.*

ROBERT FISCHER, *Appellee*.

No. 1 CA-CR 14-0183
FILED 10-8-2015

Appeal from the Superior Court in Maricopa County
No. CR2012-006869-001 DT
The Honorable Karen A. Mullins, Judge

**REVERSED AND REMANDED**

COUNSEL

Maricopa County Attorney's Office, Phoenix
By Susan L. Luder
*Counsel for Appellant*

Dwane Cates Law Group PLC, Phoenix
By Dwane Cates

and

Smith Campbell Clifford Kearney Gore, Phoenix
By Stephen C. Biggs, Steven C. Smith and Richard R. Thomas
*Co-Counsel for Appellee*

---

## OPINION

Presiding Judge Andrew W. Gould delivered the opinion of the Court, in which Judge Maurice Portley and Judge Jon W. Thompson joined.

---

**G O U L D**, Judge:

¶1            The State appeals the trial court's order granting Defendant Robert Fischer's motion for new trial.  For the following reasons, we reverse, reinstate the guilty verdict, and remand for sentencing.

### FACTS AND PROCEDURAL BACKGROUND

¶2            In late December 2010, Defendant visited his step-daughter, Belinda, and her family for Christmas.  Shortly after Defendant arrived, the family went out to dinner.  When they returned home, Defendant, Belinda, and her husband, Lee Radder, sat at the kitchen table and had a few drinks.  Belinda went to bed around 11:30 p.m., while Defendant and Radder stayed up and continued drinking.

¶3            Shortly after 5:00 a.m. the next morning, officers responded to a 911 call from Defendant.  When the first officer arrived he found Defendant kneeling over Radder's body.  Radder was dead, having suffered a close contact gunshot wound to his right eye.  In his right hand, Radder was holding Defendant's pistol, his thumb on the trigger.

¶4            Defendant was charged with Radder's murder.  At trial, the issue was whether Radder committed suicide or was murdered by Defendant.  At the end of the trial, the jury found Defendant guilty of second degree murder.

¶5            After the verdict, Defendant filed a motion for judgment of acquittal.  The court denied the motion, finding there was sufficient evidence to support the verdict.

¶6            Defendant also filed a motion for new trial, alleging (1) prosecutorial misconduct and (2) the verdict was contrary to the weight of the evidence.  The court determined there was no prosecutorial misconduct, but granted Defendant's motion on the grounds the verdict was contrary to the weight of the evidence.  Accordingly, the court set aside the verdict and granted Defendant a new trial.

¶7        Based on the court's order, the State moved to dismiss the case without prejudice to pursue an appeal.  The court granted the State's motion, and this appeal followed.

## DISCUSSION

### I.    Mootness

¶8        Defendant argues this appeal is moot because the State voluntarily dismissed the indictment.  Defendant contends that even if we reverse the trial court's order granting the motion for new trial, our decision would have no effect on the parties because there is no pending case.  *See Cardoso v. Soldo*, 230 Ariz. 614, 617, ¶ 5 (App. 2012) ("[W]e will dismiss an appeal as moot when our action as a reviewing court will have no effect on the parties.").

¶9        The issue presented is not whether we have jurisdiction over the State's appeal; we have jurisdiction regardless of whether the case was dismissed.  *See* Arizona Revised Statute ("A.R.S.") section 13-4032(2) (appellate court has jurisdiction over an appeal by the State from a grant of a motion for new trial); *State v. Birmingham*, 96 Ariz. 109, 111 (1964) (same).  Rather, the issue we must decide is whether the procedure used by the State to pursue its appeal, a voluntary dismissal, renders the appeal moot.

¶10        This appeal is not moot.  The State is not seeking to reinstate the indictment; it is seeking to reinstate the guilty verdict.  We have the authority to reverse an order granting a motion for new trial and "return the case to the posture it was in . . . before the trial court ruled on defendant's motion for new trial."  *State v. Moya*, 129 Ariz. 64, 65 (1981).  When a court grants a defendant's post-verdict motion, the State's success on appeal results "in the reinstatement of the general finding of guilt, rather than in further factual proceedings relating to guilt or innocence."  *U.S. v. Morrison*, 429 U.S. 1, 3-4 (1976); *see State v. West*, 226 Ariz. 559, 562, ¶ 13 (2011) (stating that if a verdict is vacated and subsequently dismissed, if the ruling is reversed on appeal, "the verdict of guilt can simply be reinstated"); *cf. U.S. v. Villamonte-Marquez*, 462 U.S. 579, 581 n.2 (1983) (reversal of an order vacating a defendant's convictions would,

despite the government's subsequent voluntary dismissal, reinstate the convictions).[1]

¶11 Nothing in the constitution precludes the State from pursuing an appeal after dismissing the charges. Reinstatement of a guilty verdict would not violate Defendant's double jeopardy rights. *U.S. v. Wilson*, 420 U.S. 332, 344-45 (1975); *State v. Wilson*, 207 Ariz. 12, 15, ¶ 11 (App. 2004). Nor is there is any constitutional right prohibiting the State from dismissing a case to pursue an appeal. *See State v. Million*, 120 Ariz. 10, 14-15 (1978) (State may voluntarily dismiss a case to pursue an appeal of an order granting a motion to suppress). Indeed, we have gone so far as to reinstate charges voluntarily dismissed by the State after reversing an order granting a motion to suppress. *See State v. Crotty*, 152 Ariz. 264, 267 (App. 1986) (reversing order suppressing "breathalyzer" results and ordering reinstatement of charges voluntarily dismissed by the State); *State v. Soto*, 195 Ariz. 429, 432 (App. 1999) (reinstating charges and remanding case to the trial court upon reversal of a motion to suppress).

¶12 Defendant contends that Criminal Procedure Rule 31.16, which permits a stay of the proceedings when the State appeals an order granting a defendant's motion for new trial, prohibits the State from dismissing the case to pursue an appeal.[2] We disagree.

¶13 Rule 31.16 neither creates a substantive right nor prescribes the procedure to enforce that right. *See Birmingham*, 96 Ariz. at 110-11

---

[1] Defendant argues in his supplemental brief that *Villamonte-Rodriguez* is distinguishable from the present case because it dealt with an order reversing and reinstating a judgment and sentencing, rather than a guilty verdict. Defendant asserts that the doctrine of merger, which provides an indictment merges into a defendant's judgment at the time of sentencing, was the sole basis for the Supreme Court's decision. However, the doctrine of merger was not the only basis for the Supreme Court's decision. The Court noted that, apart from merger, the government's voluntary dismissal of the case did not prevent the Court from reversing and reinstating the defendant's conviction. *Villamonte-Marquez*, 462 U.S. 579, 581 n.2.

[2] Rule 31.16 states: "An appeal by the state is inoperative to stay order in favor of defendant, except when the appeal is from an order granting a new trial or from an order granting a motion to suppress which directs the return of evidence."

(rules of criminal procedure do not create a right to appeal; the right to an appeal "can only be given or denied by constitution or the legislature of the [S]tate."). Rule 31.16 provides that, as a general matter, orders in favor of defendants will not be stayed while the State pursues an appeal. The purpose of the Rule is to prevent a defendant from being held in custody while the State pursues an appeal. Ariz. R. Crim. P. 31.16, Cmt.; *State ex rel. Berning v. Alfred*, 186 Ariz. 403, 404 (App. 1996). Rule 31.16 also creates an exception to this general rule, permitting a stay when the State appeals an order granting a new trial or an order granting a motion to suppress. Ariz. R. Crim. P. 31.16.

¶14 We do not, however, read Rule 31.16 as *requiring* the State to seek a stay before appealing an order granting a motion for new trial. Indeed, although Rule 31.16 allows the State to obtain a stay when appealing an order granting a motion to suppress, we have also permitted the State to dismiss the charges and file an appeal. *Million*, 120 Ariz. at 14-15; *State v. Rosengren*, 199 Ariz. 112, 115, ¶ 8 (App. 2000) (State permitted to voluntarily dismiss charges and appeal an order suppressing defendant's statements and DUI test results).

¶15 In sum, there were no constitutional or procedural grounds barring the State from dismissing the charges and filing an appeal. Accordingly, this appeal is not moot, and we will consider the merits.

II.    Motion for New Trial

¶16 The State argues the weight of the evidence supported the verdict, and that the trial court abused its discretion in granting Defendant's motion for new trial. Ariz. R. Crim. P. 24.1(c)(1).

A.    Standard for Granting a Motion for New Trial

¶17 Arizona Rule of Criminal Procedure 24.1(c) sets forth several grounds for granting a new trial. Ariz. R. Crim. P. 24.1 (c)(1)–(5); *See* Ariz. R. Civ. P. 59(a) (grounds for a new trial in a civil case). One basis for granting a new trial is when the verdict is "contrary to…the weight of the evidence." Ariz. R. Crim. P. 24.1(c)(1); *State v. McIver*, 109 Ariz. 71, 72 (1973); *see* Ariz. R. Civ. P. 59(a) (8).

¶18 Unlike a motion for judgment as a matter of law or acquittal, a trial court ruling on a motion for new trial based on the weight of the evidence does not view the evidence in the light most favorable to

sustaining the verdict, nor does it resolve all conflicting inferences in favor of sustaining the verdict.[3] *State v. Thomas*, 104 Ariz. 408, 411-12 (1969); *General Petroleum Corp. v. Barker*, 77 Ariz. 235, 243-44 (1954); *State v. Clifton*, 134 Ariz. 345, 348-49 (App. 1982). Rather, the court is permitted to weigh the evidence and make credibility determinations, and it may set aside the verdict and grant a new trial even if there is sufficient evidence to support the verdict. *Thomas, id.; General Petroleum, id.; Clifton, id.; see Tibbs v. Florida*, 457 U.S. 31, 42-43 (1982) ("A reversal based on the weight of the evidence, moreover, can occur only after the State…has presented sufficient evidence to support the conviction").

¶19        Given this broader discretion, some cases describe the judge's role as "the 'thirteenth juror' (the ninth juror in a civil case)." *Hutcherson v. City of Phoenix*, 192 Ariz. 51, 55, ¶ 23 (1998); *Thomas*, 104 Ariz. at 412; *McBride v. Kieckhefer Associates, Inc.*, 228 Ariz. 262, 267, ¶ 20 (App. 2011). This description, however, overstates the judge's role. A judge may not set aside a verdict "merely because, if he had acted as trier of fact, he would have reached a different result," nor may he substitute his own judgment for that of the jury. *Cano v. Neill*, 12 Ariz. App. 562, 569 ( 1970) (citing J. Moore, Federal Practice, § 59.08(5), at 3818-19 (2d ed. 1953); *see Hutcherson*, 192 Ariz. at 56, ¶ 27 (in ruling on a motion for new trial, a judge may not substitute his own judgment for that of the jury); *Cal X-Tra v. W.V.S.V. Holdings, L.L.C.*, 229 Ariz. 377, 403, ¶ 88 (App. 2012) (same); *Clifton*, 134 Ariz. at 349 (same).

¶20        The basis for this limitation on a court's discretion is the right to a jury trial, which includes the right to have a jury determine issues of fact. U.S. Const. amend. VII (right to a jury trial); Ariz. Const. art. 2, § 23 (same); *see Fisher v. Edgerton*, 236 Ariz. 71, 82, ¶ 35 (App. 2014) ("laws affecting the right to trial by jury" may not "significantly burden or impair the right to ultimately have a jury determine the issues of fact").

---

[3]        Unfortunately, it is not uncommon for courts to confuse the standard for a motion for new trial with the standard for a motion for judgment of acquittal (criminal) or a judgment as a matter of law (civil). *See General Petroleum Corp. v. Barker*, 77 Ariz. 235, 243-44 (1954) (disapproving of several decisions that improperly applied the standard for a directed verdict/judgment as a matter of law when ruling on a motion for new trial); *see also* Charles Alan Wright & Arthur R. Miller, 11 Federal Practice and Procedure Civil § 2806, pp. 80-81 & n. 1-4 (3d ed. 2015) (discussing federal cases where the court applied the wrong standard).

"The very essence of [a jury's] function is to select from among conflicting inferences and conclusions that which it considers most reasonable." *Tennant v. Peoria & P.U. Ry. Co.*, 321 U.S. 29, 35 (1944). Thus, when a judge proceeds to reweigh the evidence, she is necessarily invading the province of the jury. *State v. Neal*, 143 Ariz. 93, 97 (1984); *see Cano*, 12 Ariz. App. at 569; *Lind v. Schenley Industries Inc.*, 278 F.2d 79, 90 (3d Cir. 1960); *see Vander Zee v. Karabatsos*, 589 F.2d 723, 729 (D.C. Cir. 1978) (recognizing the danger of judicial encroachment "on the jury's important fact-finding function").

**¶21** As a result, a court considering a motion for a new trial must be mindful of maintaining the role of the jury and the integrity of the jury trial system. *Cal X-Tra*, 229 Ariz. at 403, ¶ 88 (appellate courts will "'scrutinize with care an order granting a new trial because 'meaningful review in such cases is required to maintain the integrity of the jury trial system and the practical value of court adjudication.'"), citing *Zugsmith v. Mullins*, 86 Ariz. 236, 237–38 (1959). The evidence may sharply conflict as to one or more critical factual issues, causing the court to have serious doubts about how the jury resolved those conflicts. However,

> …the court must proceed with great care in examining the defendant's motion [for new trial]. As has been stated many times, motions for a new trial are not looked upon with favor and are to be granted with great caution…Trial by jury is one of the most treasured guarantees of the Bill of Rights. Any interference with the jury's province must be exercised punctiliously.

*Clifton*, 134 Ariz. at 349.

**¶22** We therefore emphasize the well-established rule in Arizona that motions for new trial should be granted with great caution. Specifically, courts should "abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result" and it is necessary to set aside the verdict to avoid a "miscarriage of justice." *Cano*, 12 Ariz. App. at 569; *see Clifton*, 134 Ariz. at 349; *Bradley v. Philhower*, 81 Ariz. 61, 63 (1956) (a new trial may only be granted "where it is manifest from all the evidence that there has been a miscarriage of justice"); *Jimenez v. Starkey*, 85 Ariz. 194, 198 (1959) (new trial will not be granted where substantial evidence supports the jury verdict).

### B.    Appellate Review

**¶23**      We review a court's grant of a motion for new trial based on the weight of the evidence for an abuse of discretion.[4]  *State v. Neal*, 143 Ariz. 93, 97 (1984).  We "afford the trial court wide deference" in weighing the evidence and making credibility determinations "because '[t]he [trial] judge sees the witnesses, hears the testimony, and has a special perspective of the relationship between the evidence and the verdict which cannot be recreated by a reviewing court from the printed record.'" *Cal X-Tra*, 229 Ariz. at 403, ¶ 88 (citing *Hutcherson*, 192 Ariz. at 53, ¶ 12 (quoting *Reeves v. Markle,* 119 Ariz. 159, 163(1978)).

**¶24**      Although a trial judge has "wide discretion because of his intimate relation to the trial," "[t]his does not mean…that [we] abandon all supervision and fail to impose the limitation of legal standards on the exercise of" his discretion.  *McMinn*, 88 Ariz. at 262.  If our review of the record reveals "the evidence fully sustains the conviction, it is an abuse of discretion to grant a new trial."  *State v. Moya*, 129 Ariz. 64, 66 (1981); *State ex rel Morrison v. McMinn*, 88 Ariz. 261, 262 (1960); *State v. Saenz*, 88 Ariz. 154, 156 (1960).  We will reverse an order granting a new trial if "the probative force of the evidence clearly demonstrates that the trial court's action is wrong."  *Smith v. Moroney*, 79 Ariz. 35, 39 (1955).

### C.    Factual Findings

**¶25**      In reaching its verdict, the jury had to resolve one issue: who shot Radder?  The jury ultimately decided that Defendant shot Radder, rejecting Defendant's claim Radder committed suicide.   The court, however, determined this verdict was so clearly against the weight of the evidence that it was a miscarriage of justice.  The trial court made several pages of express factual findings in support of this determination.

---

[4]      The cases also have not been uniform in describing the standard of review for an order granting a motion for a new trial based on the weight of the evidence.  Once again, this primarily stems from courts applying the standard of review for a motion for judgment of acquittal or a motion for judgment as a matter of law, rather than the standard of review for a motion for new trial.  *See supra*, at ¶ 18 n.3; *State v. Spears*, 184 Ariz. 277, 290 (1996) (stating that in reviewing a motion for new trial, court must "view the evidence in the light most favorable to sustaining the verdict, and [] resolve all inferences against the defendant."); *Styles v. Ceranski*, 185 Ariz. 448, 450 (App. 1996) (same).

¶26 A court abuses its discretion in granting a motion for new trial if it reaches a conclusion without considering all the evidence. *Grant v. Arizona Public Service*, 133 Ariz. 434, 455-56 (1982); *Flying Diamond Airpark, L.L.C. v. Meienberg,* 215 Ariz. 44, 50, ¶ 27 (App. 2007). An abuse of discretion also occurs when a court makes factual findings lacking evidentiary support in the record. *Grant*, 133 Ariz. at 455-56; *Flying Diamond,* 215 Ariz. at 50, ¶ 27.

¶27 In weighing the evidence, the law makes no distinction between direct and circumstantial evidence. *State v. Carter*, 118 Ariz. 562, 564 (1978); *State v. Salinas*, 106 Ariz. 526, 527 (1971). A guilty verdict may be affirmed based "primarily or entirely on circumstantial evidence," even when there is "no direct evidence of the defendant's… participation in [a] murder." *State v. Fulminante*, 193 Ariz. 485, 493-94, ¶ 25 (1999). In addition, "[p]hysical evidence is not required to sustain a conviction where the totality of the circumstances demonstrates guilt beyond a reasonable doubt." *State v. Canez*, 202 Ariz. 133, 149, ¶ 42 (2002); *see Fulminante*, 193 Ariz. 485, 493-94, ¶ 26.

¶28 Finally, in considering the court's express findings, we will infer the necessary findings to affirm, but we "will do so only if the implied findings do not conflict with the court's express findings." *State v. Zamora*, 220 Ariz. 63, 67, ¶ 7 (App. 2009).

¶29 In reviewing the record, we conclude the trial court abused its discretion in granting Defendant's motion for new trial. The trial court erred by making factual findings that were not supported by the record, and by failing to consider all the evidence in reaching its conclusions.

### 1. DNA and Fingerprint Evidence

¶30 Based on the fact Defendant's DNA and fingerprints were not found on the gun,[5] while Radder's DNA and partial print were found on the gun, the trial court concluded that, "[i]f the Defendant had fired the gun, he would have left DNA and fingerprint evidence on the gun itself."

¶31 This finding is not supported by the record. No witness, expert or otherwise, testified that touching an item always transfers, or is even likely to transfer, DNA or fingerprints. In fact, the State's DNA

---

[5] The DNA on the magazine and grip contained a mixture of DNA; the DNA analyst was unable to determine the identity of the minor contributor.

expert, Kathleen Press, testified that simply because a person touches an item does not mean a DNA transfer will occur.

¶32 The court's finding is in direct conflict with the evidence. Defendant admitted he touched the gun the evening before the shooting. Specifically, Defendant told the officers the gun belonged to him, and that when he arrived at Belinda's house the evening before the shooting, he disassembled the weapon to hide it from the children. This occurred only hours before the shooting.

¶33 The trial court also determined that Radder's "[non-blood] DNA on the grip is evidence that he held the gun," "[non-blood] DNA on the hammer is evidence that he cocked the gun," and "non-blood" DNA on the magazine is evidence that he reloaded the magazine after Defendant had removed it the night before. The trial court concluded that there was no other reasonable explanation for the presence of Radder's "non-blood" DNA on the gun.

¶34 This finding is based on the court's conclusion that the source of Radder's DNA on the gun was "non-blood DNA," as opposed to DNA whose source is blood.[6] The court appears to have concluded that because Radder's "non-blood" DNA was on the gun, as opposed to Radder's "blood DNA" from the gunshot wound, this shows Radder held the gun before he allegedly shot himself.

¶35 Again, the court's finding is not based on the record. No witness testified that Radder's non-blood DNA was on the gun. To the contrary, there was a significant amount of blood from the gunshot wound on Radder's hands and the gun. As a result, the State's DNA expert testified that because blood is a source of DNA, it was not surprising to find Radder's DNA on the gun.

¶36 Amy Wilson, the State's crime scene analyst, never testified there was non-blood DNA on the gun. More importantly, Press, the only DNA expert who testified at trial, stated that she did not test the swabs for

---

[6] According to the Sate's expert, sources of DNA include blood, skin, saliva, and semen.

blood, and she did not know whether the source of the DNA was blood or non-blood DNA.[7]

¶37        In sum, the trial court overstated the importance of the DNA and fingerprint evidence.  This evidence only shows the obvious: Radder touched the gun.  Given the fact the gun was in Radder's hand when police arrived at the scene, this evidence is not particularly probative of Defendant's guilt or innocence.

2.        Bloody Fingerprint

¶38        In its findings, the trial court did not consider the evidence that Radder's fingerprint on the trigger was a blood print.  This evidence indicates that Radder's print was transferred to the trigger after Radder was shot and started bleeding, supporting the State's theory that Defendant placed the gun in Radder's hand after the fatal shot.

¶39        There is substantial evidence in the record showing that Radder's bloody fingerprint was on the trigger.  The parties and the trial court agree the partial print on the trigger was Radder's fingerprint.  Wilson, who collected and examined the print, was certain the print was made by blood.  In addition, the print was not smudged, indicating that the thumb had not moved after the print was made.  This was a relevant fact because the evidence indicated that if the wound was self-inflicted, Radder's thumb may have moved, at least to some degree, on the trigger.

¶40        The court seemed to discount this evidence because the print was never tested for blood.  However, the evidence shows that Wilson is trained to collect biological evidence such as blood; therefore, it is reasonable to assume she can recognize blood when she sees it.  Clearly, the trial court concluded that, at least for the purposes of collecting "non-blood DNA," Wilson was able to recognize and avoid swabbing blood on the gun. *See supra*, ¶ 36 n.7.  In addition, Wilson testified that it was the

---

[7]        The court seemed to rely on the testimony of Wilson, who testified she tried to avoid swabbing visibly bloody areas on the gun.  However, Wilson did swab some clearly bloody areas, such as one area on the magazine.  Additionally, Press testified that she performed some preliminary chemical tests indicating the swabs did not contain blood.  However, Press testified that these tests were not very sensitive for the presence of blood, and she did not perform the more sensitive DNA tests to confirm whether or not the swabs contained blood.

blood that created the print and made it visible; absent the blood, she would not have been able to locate and lift the print.

### 3. Access to Gun

¶41     The trial court concluded the gun was equally available to "the Defendant, [Radder], and Belinda [Radder's wife]."

¶42     This finding is not supported by the record. Defendant told the police that when he arrived at Radder's house, he disassembled the gun and put it in his bag to hide it from his grandchildren. There is no testimony that Radder saw the weapon or knew it was in the house prior to the shooting, or that Radder knew how to assemble the gun. Radder was unfamiliar with guns while Defendant, a retired police officer, clearly knew how to assemble and operate the gun.

### 4. Gunshot Residue (GSR)

¶43     The court reasoned that "the only evidence available to the jury to reconstruct the events surrounding Lee's death consisted of the physical evidence from the scene as interpreted by the blood experts and the statements of the Defendant made prior to trial." This is not correct. The State presented evidence showing that a particle of gunshot residue, or GSR, was found on Defendant's shirt. Conversely, no gunshot residue was found on Radder.

¶44     The court made several detailed findings concerning the presence of GSR on Defendant's shirt. For example, the court concluded the presence of GSR only means "that you either touched or were in the vicinity of a gunshot, but not that you shot a gun." Likewise, the court stated that the blood on Radder's hands may have cloaked any GSR that may have been located there.

¶45     However, there is one inference noticeably absent from the trial court's findings: the GSR was on Defendant's shirt because he shot Radder. Likewise, the absence of GSR on Radder is circumstantial evidence that he did not fire the gun.

### 5. Defendant's Statements

¶46     The court's order referenceed several statements Defendant made to the police. After discussing these statements, the court concluded the statements "are not worthy of any significant weight."

¶47        The court, however, failed to weigh the incriminatory nature of Defendant's statements.  Defendant repeatedly told the police he was sleeping in the guest bedroom when Radder was shot.  Based on the record, this statement is not true.  The blood spatter evidence, discussed more fully below, establishes that Defendant was sitting next to Radder when he was shot.  *See infra*, ¶¶ 54-56.  The evidence was so clear on this issue that defense counsel conceded in his closing that Defendant was sitting next to Radder.

¶48        While Defendant offered his intoxication[8] and possible blackout as an explanation for this inconsistency, there is one reasonable inference the jury may have reached that is never mentioned by the trial court: Defendant lied to the police because he was guilty.  It was error for the court to simply discard this inference as "not worthy of any significant weight."[9]

6.        Washing Hands

¶49        Defendant's lack of candor with the police was further illustrated by the fact that he washed his hands even though the police told him not to do so.  Based on this evidence, the jury could have reasonably concluded that by washing his hands, Defendant, a career police officer and practicing attorney, sought to eliminate any incriminating DNA or GSR evidence.  However, the trial court did not weigh the incriminating nature of this evidence in its factual findings.

7.        Blood Spatter

¶50        Three blood spatter experts testified at trial: Acosta and Griffin for the State, and Reeves for Defendant.  Acosta opined, based on the blood spatter evidence, that Radder's wound was not a self-inflicted gunshot wound, and the gun was placed in Radder's hand after the

---

[8]        The parties agreed that when the police arrived at Belinda's residence shortly after 5:00 a.m., Defendant's blood alcohol concentration was between .20 and .25.   Detective Brooks testified that when he interviewed Defendant at the station between 9:30 and 10:00, Defendant was intoxicated but coherent and able to answer questions.

[9]        In addition, when police asked Defendant "What do you feel happened," Defendant responded twice with the same equivocal answer: "I don't believe I shot him."

shooting. Reeves testified that Radder was killed by a self-inflicted gunshot wound, and there was no evidence the gun had been placed in Radder's hand. Griffin testified that, based on Reeves' theory as to how Radder was holding the gun, the source of the potential back spatter on Radder's hands could not have been a self-inflicted gunshot wound.

¶51 Ultimately, the trial court determined that Reeves was "highly credible," Griffin was "credible" and Acosta was not credible. Based on this assessment, the trial court rejected Acosta's opinions in their entirety, adopted all of Reeves' opinions, and adopted those portions of Griffin's testimony that were consistent with Reeves' opinions.

### a.    Undisputed Testimony

¶52 Despite the court's rejection of Acosta's testimony, there were some general areas of agreement between Reeves and Acosta. Both blood spatter experts, as well as the medical experts, agreed that the fatal gunshot occurred while Radder was sitting in a chair in the kitchen, and that after he suffered the gunshot wound, he slumped forward in his chair. Acosta and Reeves disagreed as to how long Radder remained in the chair, but both agreed he remained in the chair bleeding from his wound for some period of time, causing the blood to drain down from his wound and form a small pool of blood on the floor near his chair.[10]

¶53 Acosta and Reeves agreed that at some point, Radder came to rest on the floor, where a larger pool of blood formed around his head and upper torso. Both experts agreed that Defendant walked in Radder's blood after the shooting, leaving three "bloody" footprints at the scene.

### b.    Defendant's Pajamas

¶54 Despite the trial court's rejection of Acosta's credibility, Acosta's opinion regarding the blood spatter on Defendant's pajamas and chair was uncontested. Acosta testified that based on the blood spatter on Defendant's pajama pants and the corresponding void, or absence of blood, on the chair located directly next to Radder, Defendant was sitting next to Radder when the fatal shot was fired. Defense counsel conceded this fact in his closing argument.

---

[10]    According to the medical experts, after the gunshot, Radder was unconscious and no longer capable of performing any voluntary movements, although he may have been capable of some involuntary movements.

¶55 In considering this evidence, the court stated that "mere presence does not render one guilty of a crime," and that Defendant's presence in the chair next to Radder in conjunction with his statements to the police he was in the bedroom "does not mean Defendant fired the gun."

¶56 We agree this evidence is subject to differing interpretations. However, the trial court disregarded the incriminating nature of this evidence. Defendant was only a few feet away from Radder when he was shot, and he may well have been lying when he repeatedly told the police he was asleep in his bedroom at the time.

c. State's Theory

¶57 The trial court concluded "[t]he State's case was predicated entirely on Det. Acosta's theory that the Defendant manipulated the scene by picking up or dragging [Radder's] body from his chair onto the floor." In particular, the court found Acosta's testimony regarding the location and direction of Defendant's bloody footprints in support of this theory to be "wholly lacking in credibility."

¶58 The trial court inaccurately characterized the State's theory. The State's theory was not "entirely predicated" on how Radder ended up on the floor. The prosecutor conceded in his closing he did not know how Radder ended up on the floor. Acosta testified that it was only a theory, "just one of many possibilities," and that he does not know how Radder ended up on the floor. Moreover, Acosta stated that the "bloody footprint" testimony was not meant to provide a step-by-step guide of Defendant's movements at the scene. Rather, Acosta stressed the footprints showed that Defendant walked around Radder's body after the gunshot, circumstantially indicating he was manipulating the scene.

¶59 Nonetheless, the trial court assumed that every step Defendant made around Radder's body had to be shown by a bloody footprint, and if Acosta was wrong about the location or direction of a footprint, this proves Acosta was not credible. This assumption placed far too much weight on the evidentiary value of the bloody footprints. Not every footstep made by Defendant at the scene would have been memorialized by a bloody footprint, because, as the experts testified, once Defendant stepped in Radder's blood, as he walked around the house, the blood would have worn off the bottom of his foot. Perhaps more importantly, the court's conclusion that Defendant never walked near Radder's trunk or head area because there are no bloody footprints in

these areas is contrary to the evidence. Indeed, when the police arrived Defendant was kneeling by Radder's head, yet there was no trail of bloody footprints "proving" he was there.

¶60        In addition, the trial court's finding disregarded the fact, as discussed below, that a portion of Acosta's testimony and all of Griffin's testimony was focused on showing how the blood spatter on Radder's hand could not have been made by a self-inflicted gunshot wound. *See infra*, ¶¶ 63-66, 68-69, 71. The reason the State presented this testimony is clear from the record; the State's case was not "entirely predicated" on how Radder ended up on the floor, but rather, the State tried to use the blood spatter evidence to prove Defendant shot Radder, then put the gun in Radder's hand.

                    d.       Back Spatter

¶61        The court found Reeves' testimony concerning the "high velocity back spatter on [Radder's] hands," in combination with his testimony concerning the blood spatter evidence on the gun, "compelling evidence of a self-inflicted gunshot wound."

¶62        Radder's wound was a close range gunshot wound, meaning the gun was either touching or very close to his eye when he was shot. Reeves testified that Radder had a pattern of small blood stains on his hands that were consistent with the blood being blown back onto his hands by a high velocity impact, such as a gunshot. Reeves opined that this pattern of high velocity back spatter was consistent with Radder holding the gun in his palms and pulling the trigger with his thumb.

¶63        The court disregarded Acosta's opinion that there was no high impact back spatter on Radder's hands. However, it stated that Griffin was "credible in his conclusion that some high velocity back spatter was found on [Radder's] hands, and that he could not rule out the possibility of a self-inflicted gunshot wound."

¶64        The court was not completely accurate in its characterization of Griffin's testimony. Griffin testified there may have been evidence of back spatter on Radder's hands, but he could not be sure it was back spatter. Griffin testified that other events, apart from back spatter from a gunshot, could have caused some of the subject blood spatter, including stains produced by coughing from a person's mouth or expiating blood from the nose "where it's under pressure," a person landing in a pool of blood, or by "blood dripping into [a] pool of blood."

¶65        More importantly, Griffin testified that based on the grip proposed by Reeves, the "back spatter" did not line up with the wound path from Radder's eye. Griffin stated that given the location and angle of the blood stains on Radder's left and right hands, as well as certain stains on his wrist, if Radder was holding the gun with the grip proposed by Reeves, the alleged back spatter on Radder's hands could not have come from the gunshot wound. He concluded, therefore, that some "event" other than the gunshot wound would have caused the "back spatter" on Radder's hands. For example, Griffin stated that a person holding his hands in a defensive position near the gunshot wound could have produced the alleged back spatter stains.

¶66        Finally, although Griffin could not rule out Reeves' theory, he did not agree or even support it. What Griffin did state was that he could not rule out the "possibility" that, based on the back spatter, the wound was self-inflicted. However, the full context of Griffin's testimony was that even if Reeves was correct there was back spatter, he could not, based on the blood spatter evidence *alone*, rule out *any* cause of the back spatter. Griffin testified that in order to reach a conclusion on this issue, he would need additional information that he did not possess, such as the medical examiner's report, the bullet trajectory, and information regarding the orientation of Radder's chair and head at the time of the gunshot.

e.       Blood on Radder's Hands and the Gun

¶67        Both Acosta and Reeves offered testimony concerning whether the blood on Radder's hands and the gun indicated the gunshot wound was a self-inflicted wound.

¶68        Acosta testified that if Radder had shot himself, there would have been a void, or absence of blood, on his palms where he was gripping the gun; however, there was no such void. Reeves acknowledged there was some blood on Radder's palms; however, he also noted there were some voids on his palms. Reeves explained the presence of blood on the palms as blood that was projected onto his palms from the gunshot and blood flow after the gunshot. Reeves also testified that a void of blood on Radder's thumb next to the trigger guard showed that the spatter from the gunshot was blocked by the trigger while Radder was holding the gun.

¶69        In its findings, the trial court failed to consider Acosta's testimony concerning the blood drain patterns on Radder's right hand.

According to Acosta, the patterns show blood dripping downward from the gunshot wound to Radder's fingers. Acosta testified, however, that there were no similar drain patterns on the gun. As a result, he opined that Radder's hand was open and empty when the blood drained to his fingers. Otherwise, if the gun had been resting in Radder's hand at the time of the gunshot, there would have (1) been drain marks on the gun and (2) the gun would have stopped the blood from draining down to his fingers. Acosta also noted that Radder's fingers on the gun were curled up and around the grip. Yet, the blood flowed all the way down to Radder's fingernails, which he testified was inconsistent with the gun being in Radder's hand at the time of the gunshot, and more consistent with an empty hand hanging down towards the floor.

¶70        Reeves disagreed with Acosta's blood drain opinion, testifying that he observed damming of blood on Radder's thumb by the trigger and trigger guard, indicating that the blood flowed from Radder's wound and was stopped by the gun while he was holding it in his hand.

¶71        Acosta testified that a significant amount of coagulating blood was found on both sides of the gun, including the grip. According to Acosta, there should not have been such a large amount of blood on both sides of the grip if Defendant was holding the gun. In response to this testimony, Reeves stated that the source of the blood on the gun was blood projecting onto Radder's hand from the gunshot, the fall from his chair, and the subsequent blood flow after he was on the floor. Additionally, Reeves testified that there was no evidence of wiping or swiping of the blood on Radder's hand to show someone had placed the gun in his hand.

¶72        While the trial court gave Acosta's opinions little weight, the court never addressed some glaring questions regarding Reeves' credibility. For example, Radder's unsmeared, bloody fingerprint on the trigger tends to contradict Reeves' opinion the gun was in Radder's hand before the gunshot wound. *See, supra*, ¶¶ 38-39.

¶73        The trial court also failed to examine the implausibility of Reeves' theory that Radder committed suicide by shooting himself in the eye. Forensic pathologist Dr. Keen testified about a study of suicides showing that less than one-half of one percent of suicides involves the victim shooting himself in the eye.

¶74        Additionally, while Reeves' proposed weapon grip was possible, and had been observed in other prior suicides, it was certainly

"atypical." Reeves himself testified that although he had read about such cases, in 25 years as a police officer and 38 years as a blood spatter expert, he had personally never seen a suicide victim hold a gun in this manner. Dr. Keen testified that he had performed 12,000 to 15,000 autopsies, and that approximately twelve to fifteen percent of those were on suicide victims; of those, less than ten involved a suicide victim holding a gun with his thumb on the trigger.

¶75 In sum, the trial court appears to have overlooked or disregarded the fact that Reeves' theory was based on the questionable assumption that Radder, a man with a known distaste for guns, chose to (1) shoot himself in the eye, the least common location for a suicide victim to shoot himself, and (2) hold the gun backwards in his hand, using his thumb to pull the trigger, an extremely rare and uncommon grip for suicide victims.

## CONCLUSION

¶76 The evidence in this case was circumstantial, and the testimony of the blood spatter experts conflicting. However, examining all the evidence in this case, we conclude the jury properly weighed the evidence, and its verdict was not a miscarriage of justice.

¶77 There were only two possibilities explaining the death of Radder; he either committed suicide, or he was murdered by Defendant. On the one hand, the jury could have chosen to believe Radder committed suicide. If so, the jury would have to believe that Radder, a man who hated guns, somehow found Defendant's gun, which was hidden in his bag, and assembled it, despite there being no evidence that he had any idea how to put the gun together. Next, Radder walked into the kitchen, sat down, and shot himself in the eye, the most unlikely of all locations for a suicide victim to shoot himself. And of course, all of this occurred while Defendant was sitting a few feet away, apparently doing nothing to stop Radder.

¶78 The jury, however, rejected this explanation for Radder's death, concluding that Defendant shot Radder. Was this conclusion against the weight of the evidence? Did the jury run so far amok in its consideration of the evidence that this conclusion was a miscarriage of justice? Defendant certainly had the means to shoot Radder; he had brought his gun and ammunition to Radder's house. When the police arrived at the scene, Radder was lying on the floor with Defendant's gun in his hand. Radder's thumb was on the trigger, a most unusual position,

even for a suicide victim. Then, almost immediately after the police arrive and tell Defendant *not* to wash his hands, Defendant, a seasoned police officer and practicing attorney, does so anyway, potentially removing any incriminating evidence.

¶79 During questioning by the police, Defendant repeatedly lied to them, stating he was asleep in the guest bedroom during the shooting. In fact, Defendant was sitting right next to Radder when he was shot. Defendant argued he was too intoxicated to remember the whole thing, even though the physical evidence shows he was slipping and walking around in Radder's blood after the shooting.

¶80 The physical evidence also shows that both sides of the gun are covered in Radder's blood, and Radder's unsmeared, bloody fingerprint is on the trigger. Of course, Radder would only have been able to place a bloody fingerprint on the trigger *after* he was shot, not before. There is also gunshot residue on Defendant's shirt, indicating Defendant fired the gun; despite Defendant's theory that Radder held the gun next to his eye, there is not one particle of gunshot residue found on Radder. Finally, no matter how Radder got from the chair to the floor, both Acosta and Griffin testified that based on the blood spatter evidence, Radder did not shoot himself with the gun.

¶81 We are often quick to criticize juries, but more often than not, their verdicts are based on a remarkable combination of wisdom and common sense. It is little wonder that we have placed our trust in them for centuries, and that the right to a jury trial is fundamental to our system. *Duncan v. Louisiana*, 391 U.S. 145, 151-54 (1968). There are times when they are clearly wrong, and a judge has a duty to step in and vacate a verdict that is so contrary to the weight of the evidence it is a miscarriage of justice. However, that is not the case here.

¶82    Accordingly, we conclude the trial court abused its discretion in granting Defendant's motion for new trial. We therefore reverse the order granting a new trial, reinstate the guilty verdict and remand for sentencing.



Ruth A. Willingham · Clerk of the Court
F I L E D : ama